IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-01228-CMA-KLM

PRECISION FITNESS EQUIPMENT, INC.,

    Plaintiff,

v.

NAUTILUS, INC.,

    Defendant.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on Defendant's **Motion to Exclude Testimony Regarding the Parties' Performance or Terms of Dealing Under the Commercial Dealer Agreement** [Docket No. 193; Filed October 20, 2010] (the "Motion"). On November 16, 2010, Plaintiff (hereinafter "Precision") filed a Response [Docket No. 215] in opposition to the Motion. On December 3, 2010, Defendant (hereinafter "Nautilus") filed a Reply [Docket No. 220]. The Court held a hearing on the Motion on January 20, 2011. Pursuant to 28 U.S.C. § 636(b)(1)(A) and D.C.COLO.LCivR 72.1C., the Motion has been referred to this Court for disposition. The Court has reviewed the Motion [#193], Precision's Response [#215], Nautilus's Reply [#220], the entire case file, and the applicable law and is sufficiently advised in the premises. For the reasons set forth below, the Motion is **GRANTED in part and DENIED in part**.

### I. Summary of the Case

On March 27, 2003, the parties entered into a Commercial Dealer Agreement

-1-

[Docket No. 193-1] (the "Agreement") under which Precision would sell Nautilus products in a specified territory (the "Territory") during a fixed term, from March 27, 2003 to December 31, 2007. Pursuant to the Agreement, customers were divided into two categories within the Territory: "Global accounts" and all other customers.[1] "Global accounts" were defined as customers with purchase needs extending to areas outside of the Territory, and they were identified in Exhibit B to the Agreement. *Agreement* [#193-1] at 9. "Global accounts" were served by Nautilus's direct commercial sales representatives, and Precision was not authorized to sell Nautilus products to them. *See id.* at 3, ¶3(g) ("[Nautilus]'s Territory Managers will continue to work with [Global accounts] separately from [Precision]."). Precision was authorized to sell Nautilus products to all other customers within the Territory. Precision and Nautilus agreed that, with regard to these other customers, Nautilus's "direct commercial sales representatives shall cooperate with [Precision]'s representatives to make sales" by "(1) working with [Precision]'s staff as factory representatives, (2) providing technicalسsales and product support, and (3) aiding [Precision]'s staff in generating sales." *Id.* The parties also agreed that "[Precision] will determine pricing and margin standards."[2]

---

[1] Precision alleges that there were actually three types of customers within the Territory: (1) "Global accounts" to which Precision was not authorized to sell because they were served directly by Nautilus; (2) "direct accounts" or "shared accounts" to which both Precision and Nautilus's direct commercial sales staff could sell; and (3) all other customers, to which Precision had the exclusive right to sell. *Response* [#215] at 5 n.3 ("Nautilus was never supposed to sell to customers in Precision's exclusive territories (except for those 'direct accounts' or 'shared accounts' that the parties were aware of, together with 'global accounts')[.]"). Nautilus contends that nothing in the Agreement prohibited its direct commercial sales representatives from selling to any customers within the Territory.

[2] The parties disagree about the meaning of this provision. Precision argued at the January 20, 2011 hearing that the provision gave it (Precision) the authority to set pricing and margin standards for *all* sales of Nautilus products that occurred within the Territory, regardless of whether the sales were made by Precision's sales staff or Nautilus's direct commercial sales representatives and whether the sales were made to "Global accounts" or other customers. Nautilus argues that the provision only gave Precision the authority

Precision agreed to meet or exceed specified sales goals (referred to in the Agreement as "product purchase goals") for each calendar year of the Agreement term. *Id.* at 3, ¶3(f). The sales goals for each year were set out in Exhibit A to the Agreement. *Id.* at 8. To prevent Nautilus's direct commercial sales representatives from cannibalizing Precision's business within the Territory, the parties included the following provision in the Agreement:

> The wholesale product cost of any sales made by [Nautilus]'s direct commercial sales representatives in the Territory, with the exception of the Global accounts, shall be credited towards [Precision]'s product purchase goals set forth in Exhibit A at the pricing and margin determined by [Precision] and the net profit (including freight and installation charges), shall be provided to [Precision] within 30 days of payment from customer to [Nautilus].

*Id.* at 3, ¶3(g).

The parties disagree about the meaning of this provision. According to Precision, the provision required Nautilus to take two distinct actions every time its (Nautilus's) direct commercial sales representatives made a sale to a non-"Global accounts" customer within the Territory. First, Nautilus was required to credit the sale towards Precision's annual sales goal. This credit was to be given as if Precision's sales staff had made the sale, i.e., the sale was to be credited "at the pricing and margin" used by Precision's sales staff in the Territory. Second, Nautilus was required to provide Precision with the net profit it (Nautilus) made from the sale. This net profit was to be provided either as a cash payment or as a credit on Precision's revolving account with Nautilus.

---

to set pricing and margin standards for sales that Precision's sales staff made to non-"Global accounts" customers within the Territory. Thus, Nautilus argues that it was free to set its own pricing and margin standards for sales within the Territory made by its direct commercial sales representatives, regardless of whether those sales were made to "Global accounts" or other customers.

Nautilus rejects Precision's interpretation of paragraph 3(g).  Nautilus agrees that the paragraph required it (Nautilus) to credit Precision's annual sales goal when its (Nautilus's) direct commercial sales representatives made a sale to a non-"Global accounts" customer within the Territory.  But Nautilus argues that it was not required to provide Precision with the net profit from a sale made by its (Nautilus's) direct commercial sales representatives.  The dispute over the meaning of paragraph 3(g) is at the heart of this case.

In its Second Amended Complaint [Docket No. 137], Precision alleges, *inter alia*, that Nautilus breached the Agreement by (1) failing to provide Precision with the net profit from some sales made by Nautilus's direct commercial sales representatives to non-"Global accounts" customers within the Territory, and (2) failing to credit Precision's annual sales goals for these sales.  Precision further alleges that because Nautilus failed to properly credit some sales towards Precision's annual sales goals, Precision did not meet those goals.  *See Response* [#215] at 2 ("Had these undisclosed and improper sales been included in Precision's product purchase goals, Precision would have met its product purchase goals.").  The Agreement was ultimately terminated because Precision did not meet its annual sales goals.

Nautilus maintains that it did not breach the Agreement because (1) it was not required to provide Precision with net profits from sales, and (2) it accurately credited all sales made by its direct commercial sales representatives to non-"Global accounts" customers in the Territory towards Precision's annual sales goals as required by the Agreement.  *See Reply* [#220] (generally denying Precision's claim that Nautilus breached the Agreement by failing to credit Precision for certain sales made by Nautilus in the

-4-

Territory); *id.* at 11 (maintaining that when Nautilus's direct commercial sales representatives made a sale to a non-"Global accounts" customer in the Territory, Precision was entitled only to a "product purchase goal credit").

## II. Positions of the Parties

Pursuant to Fed. R. Civ. P. 16(c)(2)(D) and Fed. R. Evid. 104(a), Nautilus seeks an order excluding from introduction at trial all testimony and exhibits offered for the purpose of proving the meaning of paragraph 3(g) of the Agreement. Nautilus asserts that paragraph 3(g) "is unambiguous on its face," *Motion* [#193] at 3, and any testimony or exhibits intended to help interpret the paragraph "should be excluded," *Reply* [#220] at 11. Precision's position with respect to paragraph 3(g) is unclear from its Response [#215]. However, at the January 20 hearing, Precision explained that it will seek to introduce exhibits at trial to prove the meaning of the paragraph.

## III. Analysis

Pursuant to Fed. R. Evid. 402, "[e]vidence which is not relevant is not admissible." Further, pursuant to Fed. R. Evid. 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In this case, Nautilus essentially contends that any evidence offered for the purpose of proving the meaning of paragraph 3(g) of the Agreement is inadmissible because it is irrelevant.

### A. Applicability of the Uniform Commercial Code

The parties agree that Colorado law governs this case. *See Agreement* [#193-1] at 6, ¶14 ("This Agreement shall be governed by the laws of the State of Colorado. Any

controversies or claims arising out of this Agreement shall be subject to the exclusive jurisdiction of the state or federal courts for Boulder County, Colorado."). As an initial matter, the Court must determine whether the Agreement is a contract for the sale of goods because Colorado law treats contracts for the sale of goods differently from other contracts. *See, e.g., Amoco Prod. Co. v. W. Slope Gas Co.*, 754 F.2d 303, 307 (10th Cir. 1985) ("Colorado has adopted the Uniform Commercial Code[.]"). Contracts for the sale of goods are governed by the Uniform Commercial Code ("UCC"). Colo. Rev. Stat. § 4-2-102; *Colo. Carpet Installation, Inc. v. Palermo*, 668 P.2d 1384, 1387 (Colo. 1983) ("By its terms, the statute applies only to contracts for the sale of goods, and not contracts for labor or services."). Moreover, the UCC differs from the statutory and common law governing other contracts with respect to the relevance of extrinsic evidence offered to establish the meaning of a contract term. *Amoco*, 754 F.2d at 307 ("The UCC changes the common law of contracts in a number of ways, including in particular the use of extrinsic evidence."). Accordingly, the first issue for the Court's resolution is whether the Agreement at issue in this case is governed by the UCC.

The parties disagree about the applicability of the UCC. Precision contends that the UCC governs the Agreement. *Response* [#215] at 6-8. In response, Nautilus contends that the UCC does not govern the Agreement because the Agreement is "a contract for services" and "not a contract for the sale of goods." *Reply* [#220] at 2-3; *id.* at 3 ("The [Agreement] authorizes Precision only to market and sell Nautilus'[s] products and is a service contract, not a sales contract."). Nautilus argues as follows:

> [The Agreement] states that Precision will "sell and display" Nautilus products and market them to end users. [*Agreement* [#193-1] at 2, ¶2]. The [Agreement] does not place a minimum order requirement on Precision nor

> does it obligate them to purchase Nautilus products. In fact, sales of Nautilus products were not made under the [Agreement], but under individual purchase orders. The [Agreement] only dictates the services to be exchanged between Nautilus and Precision. For example, Precision was required to provide knowledgeable sales staff and effective marketing. [*Id.* at 2-3, ¶3(c)-(d)]. In exchange, Nautilus provided service school to sales team members and provided its brand name and recognition. [*Id.* at 3, ¶3(e)]. Precision was to display and sell Nautilus'[s] products, not purchase products from Nautilus for end use.

*Reply* [#220] at 3.

"The Uniform Commercial Code defines 'goods' to mean 'all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities . . . and things in action.'" *Colo. Carpet*, 668 P.2d at 1388 (quoting Colo. Rev. Stat. § 4-2-105(1)). "A 'sale,' by statutory definition, 'consists in the passing of title from the seller to the buyer for a price,' and a 'contract for sale' includes a present sale of goods as well as a contract to sell goods at a future time." *Id.* (quoting Colo. Rev. Stat. § 4-2-106(1)). Because the "performance of some labor or service frequently plays a role in [transactions for the sale of goods]," the Colorado Supreme Court has adopted a test for determining "the ultimate character of a contract," i.e., whether the contract is one for the sale of goods, and thus governed by the UCC, or not. *Id.* "The controlling criterion should be the primary purpose of the contract – that is, whether the circumstances underlying the formation of the agreement and the performance reasonably expected of the parties demonstrates the primary purpose of the contract as the sale of goods or, in contrast, the sale of labor or service." *Id.* The Colorado Supreme Court has explained as follows:

> "The test for inclusion or exclusion [of a contract under the UCC] is not whether goods and services are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably

>stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)."

*Id.* (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974)).

In this case, the relationship between the parties set forth in the Agreement demonstrates that Precision was primarily a distributor of Nautilus products. Hence, the Agreement can most appropriately be characterized as a dealership and distributorship agreement.

The parties have not provided, and the Court has not located, a Colorado Supreme Court decision that clearly addresses the question of whether dealership and distributorship agreements are predominantly agreements for the sale of goods, and thus governed by the UCC. Accordingly, the Court "must analyze decisions from the lower state courts in [Colorado]" and "decisions from appellate courts in other states 'in order to predict what [Colorado]'s highest court would do.'" *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1174 (10th Cir. 2008) (quoting *Wade v. Emcasco Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007)). "In the UCC context, decisions from other jurisdictions are particularly persuasive due to the uniform nature of the UCC, and where necessary, [Colorado] courts look to decisions from other state and federal courts when analyzing common provisions of the UCC." *Id.* at 1175 n.7.; *see, e.g.*, *Colo. Carpet*, 668 P.2d at 1388 (adopting verbatim language used by the Court of Appeals for the Eighth Circuit and referring to case law from three states when establishing the "primary purpose test").

One decision by the Colorado Court of Appeals suggests that distributorship and dealership agreements should be deemed to be primarily contracts for the sale of goods that are governed by the UCC. In *ADT Security Services, Inc. v. Premier Home Protection,*

-8-

*Inc.*, 181 P.3d 288, 290-91 (Colo. App. 2007), the court considered the following "Authorized Dealer Agreement":

> The agreement authorized [defendant] to sell and install electronic security service systems in homes and small businesses, enter into alarm monitoring contracts with customers, and offer the alarm monitoring contracts to [plaintiff] for purchase. Plaintiff determined the purchase price for the alarm monitoring contracts in accordance with provisions in the Authorized Dealer Guidelines which were incorporated into the agreement.

When resolving the case, the court assumed without discussion that the UCC governed the "Authorized Dealer Agreement." *ADT Security Servs.*, 181 P.3d at 293 (applying the duty of good faith and fair dealing implied in every contract subject to the UCC).

Beyond Colorado, the "strong majority of jurisdictions" that have considered the question have concluded that the UCC governs distributorship and dealership agreements. *Specialty Beverages*, 537 F.3d at 1174; *accord Belleville Toyota, Inc. v. Toyota Motor Sales*, 770 N.E.2d 177, 195 (Ill. 2002) ("Numerous jurisdictions have held that distributorship and dealer agreements, including automobile dealer agreements, are predominantly for the sale of goods and are thus governed by the UCC."); *see, e.g.*, *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 n.7 (10th Cir. 2005) (concluding that the predominant factor test dictates that a distributorship agreement for soft drinks fit within the scope of Article 2 of the UCC); *Intercorp, Inc. v. Pennzoil Co.*, 877 F.2d 1524, 1527-28 (11th Cir. 1989) (holding that Alabama law dictated that an oil products distributorship agreement fit within the scope of Article 2 of the UCC); *Jo-Ann, Inc. v. Alfin Fragrances, Inc.*, 731 F. Supp. 149, 153-55, (D.N.J. 1989) (applying New Jersey law and concluding that the UCC applied to a distributorship agreement for cosmetic products); *E. Hill Marine, Inc. v. Rinker Boat Co., Inc.*, 229 S.W.3d 813, 818 (Tex. App.

2007) (applying the "dominant factor" test and concluding that the UCC applies to a boat distributorship agreement); *Old Country Toyota Corp. v. Toyota Motor Distribs., Inc.*, 966 F. Supp. 167 (E.D.N.Y. 1997) (holding that a dealer agreement was governed by the UCC); *Sally Beauty Co., Inc. v. Nexxus Prods. Co., Inc.*, 801 F.2d 1001, 1005-06 (7th Cir. 1986) (collecting cases holding that the UCC applies to distributorship and dealership agreements, whether exclusive or non-exclusive, for automobiles, automotive parts, cattle semen, refrigerators, garage doors, beer, paper products, and food); *see also Vigano v. Wylain*, 633 F.2d 522, 525 (8th Cir. 1980) (applying the Missouri law that "distributorship agreements are not covered by Article 2 of the UCC," but stating "[w]e are inclined to disagree with this position as a matter of commercial law").

"Several of these courts note that a distributorship agreement is more involved than a typical sales contract, but apply the UCC nonetheless because the sales aspect in such a contract is predominant." *Sally Beauty Co.*, 801 F.2d at 1006 (internal quotation omitted). "The combination of these decisions leads [this Court] to predict that, if faced with the [Agreement at issue in this case], the Colorado Supreme Court would apply the UCC[.]" *Specialty Beverages*, 537 F.3d at 1174-75.

At the January 20 hearing, Nautilus relied on *Rocky Mountain Chocolate Factory, Inc. v. SDMS, Inc.*, No. 06-cv-11212-WYD-BNB, 2007 WL 4268962, at *4-5 (D. Colo. Nov. 30, 2007) (unreported decision), to argue that the Agreement at issue in this case is not a contract for the sale of goods. In *Rocky Mountain Chocolate Factory*, the court considered a "Franchise Agreement" by which a Colorado chocolate producer granted a franchise to a retailer in San Diego to open a store under the producer's name that would sell the producer's candy. 2007 WL 4268962, at *1. The court held that the UCC was

"inapplicable" to the Franchise Agreement:

> Defendants . . . cannot show that the primary purpose of the Franchise Agreement was the sale of [Rocky Mountain Chocolate Factory]'s goods. Instead, the primary purpose of the Agreement is the granting of the franchise, i.e., allowing and enabling Defendants to set up and operate a [Rocky Mountain Chocolate Factory] franchise and use its marks and products. While the Franchise Agreement also contemplated that Defendants would sell [Rocky Mountain Chocolate Factory]'s products, the agreement primarily involves the granting of, development and operation of the franchise. Thus, the Commercial Code is inapplicable.

*Id.* at *5. The court also noted that "[n]o Colorado case has applied [Article 2 of the UCC] to a franchise agreement." *Id.* at 4.

The Court is not persuaded by the reasoning in *Rocky Mountain Chocolate Factory* to deviate from the great weight of authority indicating that dealership and distributorship agreements like the Agreement at issue in this case are governed by the UCC. *Rocky Mountain Chocolate Factory* is an unreported decision, and its facts are distinguishable from the facts of this case. Moreover, if the primary purpose of the Agreement at issue here was not the sale of Nautilus's goods, the Court is at a loss to determine what it might have been. Accordingly, the Court concludes that the UCC governs the Agreement.

> **B.    Admissibility of Extrinsic Evidence of Course of Dealing and Usage of Trade Offered for the Purpose of Proving the Meaning of a Contract Term**

Section 2-202(a) of the UCC, codified at Colo. Rev. Stat. § 4-2-202(a), provides that contract terms "set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein, may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement **but may be explained or supplemented:** (a) By course of dealing or usage of trade (section 4-1-205)

or by course of performance (section 4-2-208)" (emphasis added).[3]

The official comments to Section 2-202 explain paragraph (a) as follows:

> Paragraph (a) makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.

Colo. Rev. Stat § 4-2-202, Official Comment 2.

The admissibility under the UCC of extrinsic evidence offered to explain or supplement a contract term is a departure from the Colorado common law of contracts. Under the common law, extrinsic evidence offered to show the intended meaning of a contract term is "relevant only if, after examination of the entire agreement, the [term is] ambiguous." *Union Rural Elec. Ass'n, Inc. v. Pub. Util. Comm'n of State of Colo.*, 661 P.2d 247, 251 (Colo. 1983) (citing *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, Inc.*, 195 Colo. 253, 577 P.2d 748 (Colo. 1978)); *see also Pepcol Mfg. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984) ("It is only where the terms of an agreement are ambiguous or used in some special or technical sense not apparent from the contractual document itself that the court may look beyond the four corners of the agreement in order to

---

[3] The UCC defines "course of dealing" as "a sequence of *previous* conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Colo. Rev. Stat. § 4-1-303(b) (codifying UCC § 1-205(1)) (emphasis added). "Usage of trade" is defined as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." *Id.* § 4-1-303(c) (codifying UCC § 1-205(2)). "Course of performance" refers to the sequence of conduct between the parties to a contract that involves repeated occasions for performance by one or both parties *after* execution of the contract. *See id.* § 4-1-303(a).

determine the meaning intended by the parties."). By contrast, "[u]nder the UCC, the lack of facial ambiguity in the contract language is basically irrelevant to whether extrinsic evidence ought to be considered by the court as an initial matter." *Amoco*, 754 F.2d at 308; Colo. Rev. Stat. § 4-2-202, Official Comment 1(c) ("This section definitely rejects [t]he requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous."); *see also Amoco*, 754 F.2d at 308 ("'It is proper to consider the contract's commercial setting even though the contract is not facially ambiguous.'" (quoting *Pennzoil v. FERC*, 645 F.2d 360, 388 (5th Cir. 1981), *cert. denied*, 454 U.S. 1142 (1982))).

As explained above, evidence of course of dealing, usage of trade, and course of performance is generally admissible under Section 2-202(a) of the UCC for the purpose of explaining or supplementing a contract term. Colo. Rev. Stat. § 4-2-202(a). However, Official Comment 2 recognizes that the parties to a contract may agree that course of dealing and usage of trade are not to be considered when determining the intended meaning of a contract term: "[A written contract is] to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. **Unless carefully negated** they have become an element of the meaning of the words used." Colo. Rev. Stat. § 4-2-202, Official Comment 2 (emphasis added); *see also KN Energy, Inc. v. Great W. Sugar Co.*, 698 P.2d 769, 778 (Colo. 1985) ("[T]he intent evidenced by [the parties' course of dealing] is presumed to have been incorporated into the written contract unless the intent evidenced by the [course of dealing] has been 'carefully negated' by the written terms." (quoting Colo. Rev. Stat. § 4-2-202, Official Comment 2)).

In other words, Section 2-202(a) provides a default rule that evidence of course of dealing and usage of trade is admissible to explain or supplement a written contract term. The parties to a contract can avoid this default rule by including express language in the contract to "carefully negate" the rule. *See Carter Baron Drilling v. Badger Oil Corp.*, 581 F. Supp. 592, 597 n.13 (D. Colo. 1984) (stating that course of dealing and usage of trade, "unless carefully negated, are admissible to supplement the terms of any writing, and that contracts are to be read on the assumption that these elements were taken for granted when the document was written," and then noting that "[i]n the contract under consideration there was no express renunciation of course of dealing or usage evidence"); *see also Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 9 (4th Cir. 1971) (finding evidence of usage of trade to be admissible in part because "[t]he contract does not expressly state that course of dealing and usage of trade cannot be used to explain or supplement the written contract"). To negate the default rule, express contractual language must be specific and unequivocal. *See Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc.*, 664 F.2d 772, 783 n.14 (9th Cir. 1981) (finding that a "boilerplate clause in Shell's printed-form contract . . . that evidence of dealings or waivers was disallowed as affecting 'Shell's right to require specific performance of buyer's obligations' . . . did not carefully negate all uses of evidence of prior dealings"); *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1314 (S.D. Fla. 1999) ("An integration clause which merely states that the parties intend the writing to be a complete and exclusive statement of the terms of the agreement does not suffice to negate the importance of trade usage and course of dealing[.]").

In this case, the Court finds that the parties carefully negated the default assumption that course of dealing and usage of trade were to become elements of the terms of the

Agreement. The parties included the following sentence in the Agreement: "Past practice and terms of dealing between [Nautilus] and [Precision], or in the industry generally, shall not be used to . . . interpret the terms of this Agreement." *Agreement* [#193-1] at 6, ¶16. This sentence is clearly an "express renunciation of course of dealing or usage [of trade] evidence." *Carter Baron Drilling*, 581 F. Supp. at 597 n.13. The inclusion of the sentence demonstrates the parties' *ex ante* intent that extrinsic evidence of course of dealing and usage of trade would be inadmissible for the purpose of proving the meaning of a term in the Agreement. The Court finds that this intent should be respected. *See Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 75 (Colo. 1991) (Rovira, J., dissenting) ("The official comment to section 4-1-102 of the [UCC] . . . provides that freedom to contract is a principle of the Code. Contracts between competent parties, voluntarily and fairly made, should be enforceable according to the terms to which they freely commit themselves." (citations omitted)). Accordingly, the Court concludes that evidence of usage of trade and the parties' course of dealing is not admissible for the purpose of proving the meaning of paragraph 3(g) of the Agreement.

    **C.**    **Admissibility of Extrinsic Evidence of Course of Performance Offered for the Purpose of Proving the Meaning of a Contract Term**

As explained above, evidence of course of performance is admissible under Section 2-202(a) of the UCC to explain or supplement written contract terms. Colo. Rev. Stat. § 4-2-202(a); *see also id.*, Official Comment 2 ("[T]he course of actual performance by the parties is considered the best indication of what they intended the writing to mean."). The Colorado Supreme Court has elaborated as follows:

> The parties' course of performance following execution of the contract is . . . relevant to the interpretation of the agreement. Course of performance may

> be used as an aid to interpretation whenever one party accepts repeated performance by the other party with knowledge of the nature of that performance and the opportunity to object to it. . . . Although a court must strive to harmonize the express terms of an agreement with the subsequent course of performance under that agreement, the express terms control where harmony cannot be found. The court's goal is to give effect to the parties' intention as of the time the contract was made, therefore, a course of performance may explain but not contradict the express terms of the writing.

*KN Energy, Inc.*, 698 P.2d at 779 (internal citations omitted). Accordingly, the Court finds that Precision may introduce evidence of the parties' course of performance under the Agreement for the purpose of proving the meaning of paragraph 3(g).

### D.     Admissibility of Extrinsic Evidence of Modification or Consistent Additional Terms

As a final matter, the Court briefly addresses the admissibility of extrinsic evidence offered for the purpose of proving (1) a subsequent modification or amendment to the Agreement, or (2) the existence of consistent additional terms that explain or supplement a written term in the Agreement. First, the Agreement expressly provides that it "may not be modified . . . unless in writing and signed by both parties." *Agreement* [#193-1] at 6, ¶16. Accordingly, extrinsic evidence offered to prove a modification or amendment is inadmissible unless it is in the form of a writing signed by both Precision and Nautilus. Counsel for Precision stated at the January 20 hearing that Precision would not argue at trial that there was any modification of the Agreement besides a written and executed Amendment in May 2003, which both parties agree was valid. *Id.* at 10 (a one page "Amendment to Commercial Dealer Agreement" dated May 2003).

Second, Section 2-202(b) of the UCC provides that written contract terms "may be explained or supplemented . . . by evidence of consistent additional terms **unless the court**

**finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement**." Colo. Rev. Stat. § 4-2-202(b) (emphasis added); *see id.*, Official Comment 3 ("Under paragraph (b) consistent additional terms, not reduced to writing, may be proved unless the court finds that the writing was intended by both parties as a complete and exclusive statement of all the terms."). In this case, paragraph 16 of the Agreement contains an integration clause: "16. Entire Agreement. This Agreement, the Terms and Conditions and the Credit Application constitute the entire understanding of the Parties and supersede any prior agreements, written or oral." *Agreement* [#193-1] at 6, ¶16.

Under Colorado law, integration clauses are enforceable as written. *See Nelson v. Elway*, 908 P.2d 102, 107 (Colo. 1995) ("Integration clauses generally allow contracting parties to limit future contractual disputes to issues relating to the express provisions of the contract. Therefore, the terms of a contract intended to represent a final and complete integration of the agreement between the parties are enforceable[.]" (internal citation omitted)); *Moore v. Georgeson*, 679 P.2d 1099, 1101 (Colo. App. 1983) ("Where, as here, a contract . . . contains an integration clause stating that the writing constitutes the entire agreement of the parties, it must be enforced according to its terms."); *Keller*, 819 P.2d at 72 ("Integration clauses generally permit contracting parties to limit future contractual disputes to issues relating to the reciprocal obligations expressly set forth in the executed document." (citations omitted)). Colorado courts have found contractual language that is almost identical to the above-quoted integration clause to be sufficient to show that the written contract was "intended also as a complete and exclusive statement of the terms of the agreement" between the parties. Colo. Rev. Stat. § 4-2-202(b); *see Moore*, 679 P.2d

at 1101 (finding that the inclusion of a simple integration sentence ("This instrument contains the entire agreement of the parties.") in a written contract was sufficient to demonstrate that the written contract was a complete and exclusive statement of the terms of the parties' agreement); *Nelson*, 908 P.2d at 107 n.1 (also finding that the inclusion of a simple integration sentence ("This agreement constitutes the entire Agreement between the parties pertaining to the subject matter contained herein[.]") in a written contract was sufficient to demonstrate that the written contract was a complete and exclusive statement of the terms of the parties' agreement).

The Court finds that the integration clause in the Agreement here unambiguously means that the Agreement was intended as "a complete and exclusive statement of the terms of the agreement" between Precision and Nautilus. Colo. Rev. Stat. § 4-2-202(b); *see Moore*, 679 P.2d at 1101; *Nelson*, 908 P.2d at 107 n.1. Accordingly, a term in the Agreement may not be explained or supplemented by evidence of consistent additional terms.

Precision contends that "it is entirely clear that the parties did not intend for the [Agreement] to be the complete expression of their agreement." *Response* [#215] at 8. It argues that it should be permitted to introduce evidence of consistent additional terms because the Agreement "left open numerous important terms to be determined by the parties." *Id.* The Court disagrees. Although Precision may be correct that the Agreement is silent with respect to certain details of the parties' business interaction, *see id.* at 8-10, that fact does not negate the unequivocal statement in the Agreement that "[t]his Agreement . . . constitute[s] the entire understanding of the Parties, " *Agreement* [#193-1] at 6, ¶16. Accordingly, to the extent that Precision seeks to introduce evidence of

consistent additional terms for the purpose of proving the meaning of paragraph 3(g) or another written term, such evidence is inadmissible.

## IV. Conclusion

Turning to the specific exhibits that Nautilus seeks to exclude, which were partially identified at the January 20 hearing, it is unclear whether Precision intends to offer them solely as evidence of the parties' course of performance under the Agreement for the purpose of proving the meaning of paragraph 3(g). As set out above, evidence of course of dealing or usage of trade and evidence of consistent additional terms is inadmissible for the purpose of proving the meaning of paragraph 3(g). However, evidence of the parties' course of performance under the Agreement is admissible for the purpose of explaining or supplementing a term in the Agreement. Thus, the purpose for which Precision offers an individual exhibit is critical to the question of its admissibility. Decisions about the admissibility of individual exhibits are best left to the sound discretion of the District Judge at trial, upon consideration of the purpose for which the exhibits are offered.

IT IS HEREBY **ORDERED** that the Motion [#193] is **GRANTED in part and DENIED in part**.

IT IS FURTHER **ORDERED** that evidence of usage of trade and the parties' course of dealing is not admissible for the purpose of proving the meaning of paragraph 3(g) or any other term of the Agreement.

IT IS FURTHER **ORDERED** that evidence of the parties' course of performance under the Agreement is admissible for the purpose of proving the meaning of paragraph 3(g) or any other term of the Agreement.

IT IS FURTHER **ORDERED** that evidence offered to prove a modification or

amendment to the Agreement is admissible only if it is in the form of a writing signed by both Precision and Nautilus.

IT IS FURTHER **ORDERED** that evidence of consistent additional terms offered for the purpose of explaining or supplementing paragraph 3(g) or any other term in the Agreement is inadmissible because the Agreement was intended as a complete and exclusive statement of the terms of the agreement between Precision and Nautilus.

DATED: February 2, 2011 at Denver, Colorado.

                                                  BY THE COURT:

                                                  s/ Kristen L. Mix
                                                  Kristen L. Mix
                                                  United States Magistrate Judge